## Wilson v. Smith.

(Decided October 1, 1929.)

MARTIN T. KELLY for appellant.

N. R. PATTERSON for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

In the Republican primary held in Bell county on August 3, 1929, Walter B. Smith, E. B. Wilson, J. Henry Taylor, and E. N. Ingram were candidates for the office of county attorney. Smith received 3,279 votes, Wilson 1,368 votes, Taylor 1,022 votes, and Ingram 808 votes. On August 6 the county board of election commissioners canvassed the returns and awarded Smith the certificate. Thereupon Wilson contested his nomination, on the ground that Smith had violated the Corrupt Practice Act. The special judge designated to try the contest decided in favor of Smith, and Wilson appeals.

It is earnestly insisted that not only Smith himself, but that his volunteer manager, Mr. N. R. Patterson, spent money for the purpose of corrupting the electorate. The circumstances which it is claimed show that Smith engaged in bribery are these: A witness testified that he went to the home of George Smith, father of contestee, and saw on the bed a large quantity of money, which the

father said was going to be used for the purpose of buying the election, and that contestee admitted saying on the day of the election that he was buying votes. The statement made by the witness as to what occurred at the home of George Smith was denied by the latter, and as George Smith is a Baptist preacher, and a man who intends to commit bribery rarely announces his purpose beforehand, we are inclined to follow the special judge, and accept the statement of George Smith, rather than that of the witness who testified to such an unusual occurrence. Contestee gave the following explanation of his statement that he was buying votes:

"I walked upon the porch to shake hands with Mrs. Asher, I hadn't seen her for some few months. I knew the feelings of the Ashers. I have always been very friendly to them; this lady particularly was very, very kind to me. She sent me oranges when I was sick in the hospital, when I was in high school. She said, 'How are you getting along, Walter?' I told her, 'Fine;' she said, 'Are you buying many votes?' I said in a joke, I said, 'I am buying every one I can get.' You know I could have bought them with a smile, or anything else. That was all that was said; there were several people standing on the porch when I made that remark. As far as buying votes, I never bought a vote in my life; I didn't need to buy them. It was just one of the election day jokes, or chatter, that goes on around the polls. That was all that was said. I did make that statement."

Considering the circumstances, we are inclined to the view that contestee did not intend that his statement to Mrs. Asher should be taken seriously. On the contrary, his explanation that the statement was intended as a joke is more in harmony with what a candidate would have said in the circumstances, and therefore cannot be considered as an admission by contestee that he was actually engaged in buying votes.

There is the further insistence that contestee was a reluctant witness, and failed to produce all the checks that he had drawn for some time prior to the election. It is true that he objected to producing the checks that had nothing to do with the election, and that the court sustained the objection, and it is claimed that this was error,

and that the court should have required him to produce all his checks. Even if it be conceded that the court should have required the production of all contestee's checks, we cannot say that this was error, in the absence of an avowal as to what the unproduced checks would have disclosed.

But it is insisted that contestee is chargeable with the conduct and knowledge of his volunteer manager, Mr. Patterson, and that the evidence shows bribery with the latter's knowledge. One of the circumstances relied on is the testimony of James Mills and Beckham Carter. Mills testified that Rhoda Bingham gave him $3 to vote for Walter Smith, adding: "This man here (pointing to Mr. Patterson), I think he had it, gave it to this woman, and the woman gave it to the Carter boy, and he gave it to me." Carter said that Mr. Patterson was talking to him and Mills, and said he would give $6 for their votes, $3 apiece. Afterwards he gave the money to this woman, Rhoda Bingham, and the woman gave it to them. They asked him to vote for Walter B. Smith, Henry Broughton, and Van Bever. Both Mills and Carter admitted that they did not vote. Both Patterson and Rhoda Bingham say that no such occurrence took place. On the contrary, they say that Mills and Carter were drunk, and that Patterson told her to leave those drunks alone.

The fact that some persons who sell their votes carry out their contract is sometimes referred to as their only redeeming trait. Here the redeeming trait is wholly lacking. The witnesses not only admit that they sold their votes, but boast that they did not vote, and thereby put it over on the purchasers, who failed to take the precaution to see that they did vote. In the circumstances, the court did not err in accepting the testimony of contestee's witnesses, rather than the testimony of contestant's witnesses.

Though subjected to a long and searching cross-examination, both Mr. Patterson and Mr. Smith denied that they spent any money for corrupt purposes, or employed any one else to do so, or that any money was used corruptly with their knowledge or consent. It is true that sometimes the amount of money spent by a candidate, together with circumstances under which it is expended, may be so large as to justify the inference that it was not spent for legitimate purposes. Here no such case is presented. The amount shown to have been expended was not more than was reasonably necessary to meet the

cost of advertising, and to provide a sufficient organization for the purpose of getting the voters to the polls. Notwithstanding the prevalence of bribery and corruption in elections, we have not yet reached the stage where a candidate may not conduct his campaign without resorting to such practice. On the whole, we are inclined to the view that such a campaign was conducted by contestee, as the record is singularly free from credible testimony or circumstances tending to show that money was corruptly spent by contestee or Mr. Patterson, or by any one else with their knowledge or consent.

Lastly, it is insisted that contestee's certificate of nomination should be canceled because of the failure of his manager, Mr. Patterson, to file a postelection expense account. Whether Mr. Patterson was contestee's manager, within the meaning of the statute, we deem it unnecessary to decide. It is sufficient to say that his failure to file a post-election expense account was not made a ground of contest, either in the original or amended petition, and therefore may not be relied on as a reason why contestee's certificate of nomination should be cancelled. Craft v. Davidson, 189 Ky. 378, 224 S. W. 1082.

Judgment affirmed. Whole court sitting.